**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. _____

HUMANA INC.,

    Plaintiff,

v.

GISELLE CUSHING,

    Defendant.

_____/

**PLAINTIFF HUMANA INC.'S**
**<u>VERIFIED COMPLAINT</u>**

Plaintiff Humana Inc. ("Humana"), for its Verified Complaint against Giselle Cushing, states as follows:

**NATURE OF THE ACTION**

1. This is an action for legal and equitable relief against a former employee. Cushing resigned from Humana and accepted a position with Cigna Corporation ("Cigna"), a direct competitor of Humana, in violation of her non-compete and other restrictive covenants in the parties' restricted stock unit agreements.

2. During her tenure at Humana, Cushing chose to enter into Humana's Restricted Stock Unit Agreement and Agreement Not to Compete or Solicit. Under the Restricted Stock Unit Incentive Plans, Humana awarded Cushing restricted stock units worth several hundred thousand dollars or more. As a condition of accepting the awards, she agreed to not to work on or provide Competitive Products or Services to a Competitor within one year of her departure from Humana.

3. When Cushing notified her superiors at Humana that she intended to resign to take a position at Cigna, Humana promptly reminded Cushing of her contractual obligations to Humana

pursuant to her non-compete agreement. In advance of Cushing's start date at Cigna in her new role, Humana notified Cushing and Cigna that it intended to enforce its non-compete arrangement to prevent Cushing from taking a role that contractual obligations to Humana.

4. Despite Humana's repeated correspondence to Cushing and Cigna, Cushing has taken a position at Cigna that allows Cushing to use Humana's sensitive and confidential information to the detriment of Humana and in violation of her non-compete arrangement.

5. In addition to violating her contractual non-compete obligations to Humana, Cushing has removed confidential and proprietary information from Humana, thereby violating her contractual obligations under her Confidentiality Agreement and Humana's Information Protection and Acceptable Use policy. Notably, Cushing improperly removed these materials only days before announcing her resignation from Humana and, on information and belief, after Cigna had already made a formal offer of employment to Cushing.

6. Given the nature of information that she improperly removed, Humana fears that in addition to violating her non-compete agreement Cushing intends to share its confidential and proprietary information with others at Cigna or incorporate that information into Cigna's strategic position. Such a result would have severe negative consequences on Humana's own strategic position in the Florida market.

7. Humana now seeks an order to temporarily and permanently restrain and enjoin Cushing from: (a) continuing her employment as Cigna's "South Florida Market President" for twelve months (b) directly or indirectly performing the same or similar responsibilities for a competitor that she performed for Humana for twelve months, (c) using or disclosing Humana's confidential and proprietary information and trade secrets, and breaching the restrictive covenants in the restricted stock unit agreements; and (d) providing an accounting to Humana of profit gained

by her wrongful actions. Humana also seeks an order requiring Cushing to destroy/remove all of Humana's sensitive, proprietary and confidential information which she still possesses or controls. Finally, Humana seeks an award of compensatory damages and fees as allowed by law.

## PARTIES & JURISDICTION

8. Humana is a Delaware corporation with its principal place of business in Louisville, Kentucky. Humana is authorized to conduct business in Florida.

9. Cushing is a resident of Broward County, Florida.

10. The value of Humana's claims and requests, exclusive of interest and costs, exceeds $75,000.

11. Accordingly, this Court maintains diversity jurisdiction over this action. *See* 28 U.S.C. § 1332.

12. This Court has personal jurisdiction over Cushing and venue is proper in this District. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Humana's claims occurred in this District.

## FACTS

13. Humana is a national health and well-being company that provides and administers medical, dental and vision insurance plans to large group, public sector and small group participants.

14. Giselle Cushing ("Cushing") worked for Humana in the South Florida market from approximately August 2008 to June 26, 2020. From early 2014 until her last day of work, she held the highest-ranking regional position in South Florida over commercial and specialty insurance, including commercial health insurance, dental insurance and vision insurance products. She had direct responsibility for sales and was a key part of the team that developed strategy for other

3

operating aspects of the South Florida market, such as provider networks, marketing, and products. Her most recent title was South Florida Market Vice President for Sales and Distribution. (See Ex. A, Remmers Declaration ¶4).

### Cushing's Role and Access in South Florida

15. South Florida is a chiefly important market for Humana, particularly when it comes to large commercial accounts. As Market Vice President, Cushing's mission was to advance Humana's competitive position in all commercial and specialty product lines across the South Florida market. She led a team of over 30 Humana employees. These employees were focused almost exclusively on the South Florida market. Cushing also worked collaboratively with peers in Humana's other Florida regions on overall state-wide strategy. (See Ex. A, Remmers Declaration ¶ ¶ 3, 5; Ex. B, Hunter Declaration ¶ 3.

16. Cushing oversaw the planning and execution of Humana's overall employer group sales strategy for the South Florida region, competing against other health insurance providers in the area selling commercial health, dental and vision insurance plans. She was also involved in and heavily contributed to the overall commercial group business strategy in South Florida. (See Ex. A, Remmers Declaration ¶6).

17. Cushing helped to create Humana's confidential and proprietary pricing and marketing strategies in Florida for brokers/agents, including commissions. She directed implementation of targeted broker "blueprints" designed to motivate sales of Humana's products over competitor products, including Cigna products, carried by these same brokers/agents. (See Ex. A, Remmers Declaration ¶7; Ex. C, Willis Declaration ¶¶4-5).

18. Cushing worked closely and directly with Humana's provider contracting team, who set rates, negotiate provider contracts, and expand the network of health systems under

contract with Humana in the South Florida region and throughout Florida. Cushing was also aware of and involved with various strategic initiatives by Humana to expand its provider network in the South Florida market. (See Ex. A, Remmers Declaration ¶8; Ex. C, Willis Declaration ¶5).

19. Cushing worked closely with Humana's Director, Market Development and Strategy, Karen Elliott ("Elliott"), and with Humana's Regional Vice President, Jennifer Willis ("Willis"), and was involved in every market strategy decision for South Florida. (See Ex. C, Willis Declaration ¶¶4-6).

20. Over the past 12 months, Cushing and Elliott met weekly to create marketing plans for South Florida and met monthly with dozens of Humana employees from every aspect of the business, including pricing actuaries, clinical/pharmacy, contracting and provider networks, to discuss development of the South Florida market. Cushing and Elliott led the planning and discussions. (See Ex. A, Remmers Declaration ¶12; Ex. C, Willis Declaration ¶¶5-6).

21. The marketing efforts spearheaded by Cushing were developed into a formal strategic plan, the Market Operating Plan, for South Florida. To develop the Market Operating Plan, Cushing had access to Humana's confidential and proprietary information such as pricing, cost data, and customer account information, including proprietary data developed by Humana of the factors used to assess the underlying cost of care to Humana and its competitors known as "parity" information. (See Ex. A, Remmers Declaration ¶¶12-13; Ex. B, Hunter Declaration ¶¶4-5; Ex. C, Willis Declaration ¶6).

22. On March 12, 2020, Cushing presented the Market Operating Plan to Humana's Executive Leadership Team at a meeting held in Miramar, Florida. (See Ex. A, Remmers Declaration ¶ 14; Ex. B, Hunter Declaration ¶5; Ex. C, Willis Declaration ¶7).

23. In March, May and June of 2020, as the Market Operating Plan was implemented, Cushing and Elliott led regular conference calls focusing on strategic goals. Cushing continued to set the agenda for sales and client-facing matters and to participate in all other aspects of the business discussions. (See Ex. A, Remmers Declaration ¶16; Ex. C, Willis Declaration ¶8)

24. Cushing's role in developing market strategy at Humana was not limited to any particular client size or segment. Her work included targeting larger clients, which Humana typically refers to as 300+. In 2020, Cushing and her reports developed strategies to target the larger clients. (See Ex. A, Remmers Declaration ¶10-13; Ex B, Hunter Declaration ¶5; Ex. C, Willis Declaration ¶4, 9).

25. Cushing had access to market operating plans for not only the South Florida region, but other market divisions of Florida, as well. These plans contain strategy for all of Humana's operations and essentially constitute the company's market-specific playbooks. (See Ex. A, Remmers Declaration ¶13).

26. Under the terms of agreements with Humana, Cushing has expressly acknowledged that her services to Humana were of a special, unique and extraordinary character and that her work placed her in a position of confidence and trust with respect to Humana's operations.

### Cushing's Non-Compete and Non-Solicitation Agreements

27. From 2015 to 2020, Cushing and Humana entered into seven restricted stock unit agreements. Three of these agreements contained explicit non-compete provisions, and all seven contained non-solicitation provisions. (See Ex. L, Charles Schwab & Co., Inc. Declaration).

28. More specifically, in 2019 and 2020, Cushing agreed not to perform (directly or indirectly) the same or similar responsibilities with a competitor of Humana or in connection with a Competitive Product or Service. "Competitor" is defined in the agreements as "Grantee or any

other person or organization engaged in, or about to become engaged in research or development, production, marketing, leasing, selling or servicing of a Competitive Product or Service." A "Competitive Product or Service" is "any product, process, system or service (in existence or under development) of any person or organization other than [Humana] that is the same as, similar to, or competes with a product, process, system or service (in existence or under development) upon which Grantee worked or for which Grantee had responsibilities at [Humana] during the 24 months prior to" the last day of work. (See Ex. D, Humana Inc. Restricted Stock Unit Agreement and Agreement Not to Compete or Solicit under the Amended and Restated Stock Incentive Plan (2020) (Sections II(A) and III(F); Ex. E, Humana Inc. Restricted Stock Unit Agreement and Agreement Not to Compete or Solicit under the 2011 Stock Incentive Plan (2019)(Sections II(A) and III(F)).

29. The 2019 and 2020 agreements prohibit Cushing from working for a Competitor at all, unless and until Humana receives written assurances from both Cushing and the putative employer, satisfactory in Humana's sole discretion, that Cushing (a) will not work on or provide competitive products or services and (b) will not otherwise use or disclose Humana's confidential information or trade secrets.

30. The restricted stock unit agreements also prohibit Cushing from soliciting or attempting to solicit Humana's business partners or employees. (See Ex. D and E, Sections II(B) and (C)).

31. Cushing's restrictive covenants apply anywhere that she, during her last two years with Humana, provided material services on Humana's behalf. The restrictive covenants will remain in effect for the twelve months immediately following her last day with Humana. (See Ex. D and E, Section III (F)(2)(v) and (vii)).

32. Cushing acknowledged in these agreements that her restrictive covenants are fair, reasonable and necessary to protect Humana. (See Ex. D and E Section II).

33. Cushing and Humana elected Kentucky law to govern the construction and enforcement of her restrictive covenants and Delaware law to govern the remainder of these agreements. (See Ex. D and E, Section II(F)).

**Cushing's Confidentiality Agreement**

34. As a condition of employment and continued employment, Cushing entered into a Confidentiality Agreement promising to only access and use information to perform her job duties and not to transfer or remove confidential information from Humana except as authorized. (See Ex. F, Schraudenbach Declaration ¶3-5 and attached Confidentiality Agreement).

35. The Confidentiality Agreement covers all information and documents concerning Humana's business operations and relationships not generally known to the public, such as lists, billing, pricing, sales or other financial information, projections, research, product plans, products, services, business or marketing plans, developments, formulas, methods, processes, practices, specifications, designs, contracts, negotiations, records, data, documents, presentations, manuals, client lists, and books of business. (See Ex. F, Confidentiality Agreement).

36. Under the terms of the Confidentiality Agreement, Cushing agreed that if her employment with Humana ended, she would deliver all such confidential information to Humana, including copies, and would not keep it or deliver it to anyone else. (See Ex. F).

37. In addition to the Confidentiality Agreement, Humana maintains an Information Protection and Acceptable Use Policy broadly prohibiting employees from removing Humana's confidential and proprietary information from Humana's computer systems. This prohibition includes emailing Humana's confidential and proprietary information to a personal email account

or uploading it to a personal computer. (See Ex. F, Schraudenbach Declaration ¶6-7 and attached Information Protection and Acceptable Use Policy).

### Cushing's Resignation and Imminent Breaches with Cigna

38. On or about June 11, 2020, Cushing gave notice of her intentions to leave Humana. Her last official day as an employee of Humana was June 26, 2020. Initially, Cushing did not identify her new employer, but after inquiry by Humana, disclosed that she was leaving to work for Cigna. (See Ex. A, Remmers Declaration ¶17; Ex. C, Willis Declaration ¶10).

39. Cigna is a direct competitor of Humana in the South Florida region and elsewhere for commercial insurance products, including medical, dental, and vision insurance plans. (See Ex. A, Remmers Declaration 18-20).

40. Upon information and belief, Cushing has already begun work to with Cigna as "South Florida Market President."

41. Cushing's former role as Humana's Market Vice President and new role as Cigna's "Market President" overlap significantly. She will still be working in the same geographic region. She will still be overseeing both sales and broader business strategy for Cigna's commercial insurance products. And she will still be working to secure and advance commercial plans of all sizes. The positions' respective job descriptions and summaries, like the titles themselves, further indicate that Cushing's respective duties and responsibilities overlap significantly between Humana and Cigna.  (See Ex. A, Remmers Declaration ¶18; Ex. C, Willis Declaration ¶11-13).

42. Furthermore, Cushing's own statements about her work at Humana demonstrate that her actual duties went beyond those in the Market Vice President job description. In her own LinkedIn profile, she has claimed "significant success in leading organizations with emphasis on driving revenues and profitable membership growth"; that she is "well-known in the industry and

Florida market as a thought leader with strong broker relationships"; and that she has provided "executive level leadership for Humana's employer-focused business including large and small group sales and distribution." (See Ex. G, LinkedIn profile).

43. Furthermore, both Humana's and Cigna's products are often sold through the same brokers/agents. During her time with Humana, Cushing was responsible for developing Humana's targeted approaches for these brokers/agents. She is familiar with Humana's targeted agency plans, called "Blueprints," and commissions/incentives for them. (See Ex. A, Remmers Declaration ¶19; Ex. C, Willis Declaration ¶12).

44. More specifically, approximately 100 brokers operate in the South Florida mid-market segment. Cushing worked with these brokers as Humana's Market Vice President. Upon information and belief, she is continuing or will continue working with these brokers as Cigna's "Market President." (See Ex. A, Remmers Declaration ¶19; Ex. C, Willis Declaration ¶12).

45. Humana has asked Cushing and Cigna multiple times to confirm that Cushing will abide by her restrictive covenants. On June 12, 2020, Humana sent Cushing a letter instructing her as to her continuing non-compete obligations under the restricted stock unit agreements and providing contact information for Humana's in-house counsel. (See Ex. H, Humana letter June 12, 2020).

46. On June 18, 2020, Cigna's in–house representative, Janet Lee, emailed Humana's in-house counsel, Jennifer Starr, in response to Humana's letter concerning her non-compete. Over the next few days, Humana provided information to Cigna regarding Cushing's work for Humana, and Cigna provided information to Humana including Cushing's title, "Market President," and a written job description. (See Ex. I, Cigna job description).

47. On June 30, Humana sent Cushing and Cigna a letter outlining Humana's concerns more specifically in light of the information it received about Cushing's position with Cigna and advising that Humana would take legal action to enforce the non-compete agreement. (See Ex. J, Dinsmore Letter June 30, 2020). Neither Cigna nor Cushing responded, but an attorney representing Cushing contacted Humana's counsel to advise of his appearance and sent an email late in the evening on July 3 stating that Cushing "was in full compliance with all of her contractual obligations" to Humana, without providing any supporting facts.

48. Cushing and Cigna have failed to provide adequate assurance that Cushing, in her new position, (1) will not work on or provide competitive products or services and (2) will not otherwise use or disclose Humana's confidential information or trade secrets.

## Removal of Confidential Information

49. On or about June 1, 2020—before announcing her resignation from Humana, but after receiving her offer of employment from Cigna—Cushing removed sensitive, proprietary and confidential documents from Humana's system to her personal email account. This information was developed by Humana and is not generally known to the public.

50. More specifically, Cushing sent documents that resided on Humana's system to her own personal email account. One document, "South Florida Dynamics.docx" included information regarding a strategic initiative for the South Florida market entitled "Project Slingshot." Broadly stated, Project Slingshot is a competitively sensitive project whereby Humana evaluated its provider network for the South Florida market and how its provider contracts affected its competitive parity position for that particular market. (See Ex. K, Bradshaw Declaration ¶6-7).

51. Another document that Cushing removed from Humana's system on June 1 was entitled "Copy of Repricing comparison SFL 01-2020.xlsx" and includes confidential information

about Humana's comparative provider discount strength for its commercial insurance products in the South Florida market. (See Ex. K, Bradshaw Declaration ¶6-7).

52. Upon information and belief, Cushing is misusing or intends to misuse this confidential business information to benefit Cigna and directly injure Humana's competitive standing and business relationships.

## COUNT I – BREACH OF NON-COMPETE AND NON-SOLICITATION AGREEMENTS

53. Humana incorporates by reference the allegations previously set forth in this Verified Complaint.

54. The conduct set forth above falls within the time and place limitations of Cushing's restrictive covenants.

55. By engaging in the conduct set forth above, Cushing has breached her restrictive covenants and agreements with Humana, including but not limited to the clauses regarding non-competition, non-solicitation, and confidentiality.

56. Upon information and belief, Cushing is using confidential and proprietary knowledge and information gained through her position with Humana to cause irreparable damage to Humana's customer relationships and good will.

57. Humana has legitimate business interests in its relationships with brokers, agents and customers.

58. As a result of Cushing's breaches, Humana has suffered immediate and irreparable injury and will continue to suffer such injury unless Cushing is immediately and permanently restrained and enjoined from such activity by order of this Court. Humana has no adequate remedy at law to address this injury.

59. Cushing acknowledged in her restricted stock unit agreements that breach of her restrictive covenants would cause Humana to sustain immediate and irreparable loss and damage. She further acknowledged that Humana's remedy at law for such a breach will be inadequate.

60. In addition to the incalculable damages for which injunctive relief is sought, Humana has also suffered damages and expenses in an amount to be determined at trial.

### COUNT II – BREACH OF CONFIDENTIALITY AGREEMENTS AND DUTY OF LOYALTY

61. Humana incorporates by reference the allegations previously set forth in this Verified Complaint.

62. Accessing Humana's confidential business information and forwarding it to a personal, non-business account is a breach of Cushing's Confidentiality Agreement and of her common-law duty of loyalty to Humana.

63. On information and belief, Cushing's continued access to Humana's confidential and proprietary information when she is no longer employed by Humana is an on-going violation of her Confidentiality Agreement and of her common-law duty of loyalty to Humana.

64. Humana has legitimate business interests in its proprietary information and day-to-day operations.

65. As a result of Cushing's actions, Humana has suffered and will suffer immediate and irreparable injury unless Cushing is immediately and permanently restrained and enjoined from possessing, accessing and using Humana's confidential information.

66. Cushing acknowledged in her Confidentiality Agreement that Humana is entitled to injunctive relief to prevent misappropriation, unlawful possession, use or disclosure of its

confidential information and agreed to pay Humana's reasonable attorney's fees, expenses and costs to enforce the agreement.

67. In addition to the incalculable damages for which injunctive relief is sought, Humana has also suffered damages and expenses in an amount to be determined at trial.

WHEREFORE, Humana respectfully requests that the Court:

A. Temporarily and permanently restrain and enjoin Cushing from
   i. Continuing her employment as Cigna's "South Florida Market President" for twelve months,
   ii. Directly or indirectly performing the same or similar responsibilities for a competitor that she performed for Humana for twelve months,
   iii. Using or disclosing Humana's confidential and proprietary information and trade secrets, and
   iv. Breaching the restrictive covenants in the restricted stock unit agreements;

B. Order Cushing to destroy and dispossess herself of any of Humana's sensitive, proprietary and confidential information which she still possesses or controls;

C. Order Cushing to account to Humana for her profit and the actual damages suffered by Humana as a result of her conduct;

D. Award compensatory damages to Humana as allowed by law;

E. Award attorneys' fees and costs to Humana as allowed by law;

F. Grant trial by jury on all issues so triable; and

G. Grant all other further relief to which Humana is entitled or which the Court deems equitable and just.

Respectfully submitted,

/s/ Luis S. Konski
Luis S. Konski
Fla. Bar No. 207837
Email: lkonski@fowler-white.com
Daniel A. Milian
Fla. Bar No. 74803
Email: dmilian@fowler-white.com

FOWLER WHITE BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 789-9200
Facsimile: (305) 789-9201

Kathryn A. Quesenberry
  (*pro hac vice* motion forthcoming)
Lira A. Johnson
  (*pro hac vice* motion forthcoming)
DINSMORE & SHOHL, LLP
101 South 5th Street, Suite 2500
Louisville, Kentucky 40202
Telephone: (502) 581-8000
Facsimile: (502) 581-8111
Email:  kathryn.quesenberry@dinsmore.com
            lira.johnson@dinsmore.com

## **VERIFIED DECLARATION**

I, Rick Remmers, Humana Inc. Senior Vice President Employer Group Sales, declare under penalty of perjury that I have reviewed the facts in this Complaint and verify that they are true and accurate to the best of my knowledge, information, and belief.

/s/ *Rick Remmers*

Rick Remmers